[No. 2424.]

## GUY WILLIAMS v. THE STATE.

1. ASSAULT TO MURDER—INDICTMENT conforming in substance to No. 357 of Willson's Criminal Forms is sufficient to charge the offense of assault with intent to murder.

2. SAME—SELF DEFENSE.—By the charge of the court upon the issue of self defense, in this case, the right of the accused to kill his assailant before resorting to other means than retreat to avoid the threatened injury was restricted to the prevention of murder, maiming or disfiguring, giving no such right, until he had resorted to all other means except retreat, where the threatened injury might have been other serious bodily injury. *Held*, erroneous.

3. SAME—THREATS.—See the opinion *in extenso* for a state of proof where under the failure of the trial court to charge the jury the law relating to threats was material and fatal error.

4. SAME—BILL OF EXCEPTIONS, which assails generally the entire charge of the court, specifying no particular errors, is entitled to no consideration at the hands of the Appellate Court.

5. SAME—EVIDENCE of the flight of the accused after the return of indictment against him, and of his effort to obtain false testimony to be used on his trial, is always admissible for the State, and especially when the inculpatory evidence is circumstantial.

APPEAL from District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for an assault to murder one G. H. Gassaway. The penalty assessed against the appellant was a term of three years in the penitentiary.

Captain G. H. Gassaway was the first witness for the State.

He testified that he lived about eight miles west of the town of Marlin, Falls county, Texas. He knew the defendant on December 23, 1885, prior to which date he had seen him a few times about town. Witness came to the town of Marlin on the twenty-third day of December, 1885, and, after walking about town awhile, stepped into Henry Simon's saloon, which stands on Live Oak street, fronting north. While standing at the billiard table, in the center of the saloon, facing south, and with his back towards the front door, talking to James Storey, the witness heard the clicking of the hammers of a gun behind him. He turned his head and saw the defendant with a cocked gun in his hands. He stepped in front of the witness and said to him: "G—d d—n you, I am going to kill you." He covered the witness with the gun, but before he could discharge it he was seized from behind by Clark Williams, a colored man, who forcibly disarmed him and ejected him from the house through the back way. The witness frequently visited Marlin. His usual stopping place was at Captain Carter's bank, known as the Falls County Bank. He frequently visited the saloon of Henry Simon, when in town, in which saloon the defendant found him on the day of this offense. The defendant made strenuous efforts to escape from Clark Williams.

Cross examined, the witness said that his acquaintance with the defendant was very limited. He had not spoken to him for six months prior to the assault, but had doubtless seen him on the streets. When witness was at Captain Carter's bank on one occasion, in July, 1885, the defendant came to him and told him that he owed him five dollars. Witness asked him what for. He replied that he charged that much for his services at the witness's house at a party given by the witness some time previous. The witness protested against paying so high for such service, and it was finally agreed that defendant should accept and witness pay two dollars and fifty cents. Witness thereupon gave him a check on the bank for two dollars and fifty cents. Receiving that check, the defendant said that witness owed one Burnes for like service at his party, and that Burnes had requested him to collect from the witness for him. Witness asked him how much Burnes demanded. He replied that he supposed Burnes would be satisfied with a like sum paid him. The witness then drew a second check for two dollars and fifty cents and handed it to the defendant for Burnes. Soon after this transaction the witness went to Hare's stable to get

his buggy and go home. While waiting for his buggy a colored man who said that his name was Burnes came to witness and told him that witness owed him for his services at the party. Witness told Burnes that he had handed money to Guy Williams, the defendant, for him, but a few minutes before. The witness had barely concluded his statement to Burnes when defendant, who had evidently overheard the conversation, stepped out of the stable and said that witness stated a falsehood; that he had not paid him for Burnes, and that the five dollars paid by witness was the amount due him. Witness spoke roughly to defendant and cursed him after defendant had insulted him in the manner stated and had denied receiving the money for Burnes. Besides the conversation incident to the transaction related, the witness had never spoken to the defendant, so far as he could remember.

The defendant's counsel at this point asked the witness if he did not, on the day of the difficulty, and shortly before it occurred, while standing at the front door of the saloon, say to some one with whom he was talking: "There goes a God d—d yellow son of a b—h, and I intend to kill him if it costs me ten thousand dollars." The witness replied that he made no such statement. The defendant's counsel then asked the witness: "Did not the defendant, when he went to you in Simon's saloon, say to you: 'Mr. Gassaway, I have heard that you called me a God d—d son of a b—h?' and did you not then ask him: 'What if I did?' and did you not then make a demonstration as if to assault the defendant?" The witness replied that nothing of the sort occurred or was said. Witness was then asked: "Did you not put your hand about your breast? and did you not put your hand in your vest and get a pistol partly drawn? and was it not at that time that defendant presented the gun, and when he presented his gun did he not tell you not to draw your pistol on him, and that if you did he would kill you? and did not the defendant then take his gun down, and was it not then that Clark Williams came in and carried the defendant off?" Witness replied that no such a transaction or conversation occurred. Witness had no pistol at the time and made no manner of demonstration upon defendant at the time of the assault. Witness was then asked if he remembered saying to the defendant during the trouble: "You are mistaken about it." Witness replied that he remembered making some such remark, but did not know now what called it out. Re-examined, the witness stated that he

had no pistol on his person when defendant assaulted him, but got one immediately afterwards.

James Story testified, for the State, that he was in the town of Marlin, Texas, on or about December 23, 1885. He met Captain Gassaway in Simon's saloon, and was engaged in conversation with him at the billiard table, about midway between the front and the back doors, when the defendant came into the saloon. Witness first observed defendant when the latter stepped in front of Gassaway and said something that the witness did not clearly understand. Gassaway then, as well as witness could remember, made a slight movement towards defendant, when defendant presented his gun and said something about shooting. Witness became very much excited and got away from that vicinity as rapidly as he could. Clark Williams caught the defendant from behind just as witness was leaving, and took him off through the back door.

Cross examined, the witness said that some words passed between Captain Gassaway and the defendant, but the witness was too much excited to understand what was said. Defendant may have said something about a " d—d son of a b—h," and witness thought he did, but would not so state positively. Witness did not hear the clicking of the gun hammer when defendant came up. The first thing observed by witness was the defendant stepping in front of Gassaway, with his gun about half presented. Quite a number of people were in the house and there was some confusion.

John LaPrelle testified, for the State, that he lived in the town of Marlin, and knew both the defendant and Captain Gassaway. Defendant lived in Marlin. On the evening of December 23, 1885, while standing on the side walk in front of his store, he saw the defendant with a gun in his hands, going down the street on the opposite side. He carried his gun with the muzzle pointing to the ground. He continued down the street as far as witness watched him, pausing momentarily to look into Captain Carter's bank as he passed it. Witness heard in a few minutes of the defendant's effort to kill Captain Gassaway. Captain Gassaway generally made Carter's bank his headquarters when in town. On his cross examination, the witness said that the defendant had worked for Captain Carter, and may have been in his employ at that time.

Henry Simon testified, for the State, that he was the proprietor of the saloon in which the assault was committed. Captain

Gassaway and some other gentleman having finished a game of billiards, stood against the table in conversation. About that time defendant came in at the front door of the saloon, gun in hand, the muzzle pointing towards the floor, passed through, and went towards the billiard table. Witness was then busy behind his bar, which was in the front part of his house. His attention was attracted by loud talking soon after the defendant went through the saloon towards the billiard table. Looking in that direction he saw the defendant standing in front of Gassaway, with his gun presented. Gassaway made no manner of demonstration towards defendant that the witness saw. Clark Williams came in at the front door very soon after the trouble commenced, walked directly through the saloon to the parties, and took the defendant off. Defendant made one or two efforts to get away from Williams, who was a much more powerful man than he was. Witness heard some cursing during the difficulty, but could not distinguish the words spoken.

Z. T. Harlan was the next witness for the State. He testified that he had known defendant a number of years, and knew his voice perfectly well. On the second Friday night preceding this trial, the witness overheard a conversation between the defendant and a man whom he, witness, did not recognize. That conversation took place in front of the witness's house, in Marlin, between eleven and twelve o'clock. The witness had been asleep on his gallery, but the depredations of the town cow upon his yard aroused him, and he had just turned her out and got back to his cot when the defendant and his companion reached the point in front of his house. They were discussing this case. Defendant said that the parties interested in the prosecution were getting up evidence against him, and were concocting some lies to be proved, and that he was compelled to do the same thing. He then offered his companion thirty dollars if he would get up some certain testimony for him. The man replied to defendant that thirty dollars was not enough for the service. Defendant replied that he had but two hundred dollars to use in getting up testimony, and could not pay more than thirty dollars for the evidence he wanted his companion to get. Witness distinctly recognized the defendant's voice.

Captain G. A. King testified for the State, that defendant came to his saloon in Marlin with a gun on the evening of and a short time before the alleged assault. He asked for some cartridges with which to shoot a hog. Witness had none that

would fit his gun and he left. A few minutes later witness heard of the difficulty at Simon's saloon.

Deputy Sheriff Barlow testified, for the State, that he arrested defendant some time in January, 1886, on this charge. Defendant was released on bail. He could not be found when his case was called later in the same month. Witness, with a requisition, afterwards went to Florida, in which State he re-arrested the defendant in May, 1886. The State then introduced the record of the forfeiture of the defendant's bail bond and closed.

William Moore, the half brother of the defendant, was his first witness. He testified that he was in Simon's saloon at the time of the difficulty, having gone there to get a pitcher of beer. He was standing near and behind the counter when the defendant passed through the front of the saloon going to the billiard table at which Gassaway and another man were standing. Defendant had the butt of his gun under his arm, the muzzle pointing to the ground. When defendant got near Captain Gassaway, whose face was turned from him, he said: "Mr. Gassaway! Mr. Gassaway!" and stepped in front of him. He then said to Captain Gassaway: "I heard that you said I was a son of a b—h." Captain Gassaway asked: "What if I did?" thrust his right hand into his bosom, and partly drew forth a white handled pistol. Defendant covered him with his gun, and said: "Don't you draw that pistol on me. If you do I will kill you." Gassaway removed his hand from his breast, and defendant dropped his gun. After some further talk, Gassaway made another effort to get his pistol, when defendant again presented his gun and threatened to kill Gassaway if he drew the pistol. While defendant had his gun up the second time, Clark Williams came in, seized and carried him out of the back door, defendant making no resistance, or attempt to get loose. Gassaway followed the defendant as he was being carried out, having fully drawn his pistol, which he held in his hand, and said: "God d—n him, you had better take him out, or he will have to be carried out on a chip." Quite a number of people were in the saloon. Defendant did not cover Gassaway with his gun until Gassaway made an effort to get his pistol. At the time of the difficulty the witness was standing behind the saloon counter, which was on the west side of the saloon and north of the billiard table. Gassaway then faced the rear of the building, south. The distance between witness and Gassaway at the time was fifteen or twenty feet.

William Graves was the next witness for the defense. He testified that he was in Simon's saloon when the difficulty occurred. He was sitting on the opposite side of the saloon, and behind Gassaway and Storey, when the defendant arrived upon the scene. Defendant walked around Gassaway to face him, and said something which the witness did not understand. Gassaway made some reply, and, as well as witness could tell, put his hand about his breast as if to draw a pistol. The defendant, who up to this time had held his gun muzzle down, covered Gassaway with it, and told him that he would kill him if he moved. The witness did not see a pistol in Gassaway's hand, and, being behind him, could not have seen it if he had had one in his hand. Clark Williams came into the saloon while defendant had his gun drawn on Gassaway, and took defendant out of the saloon. Much cursing and swearing was done, but witness could not remember what was said.

Ed. Brown, for the defense, testified substantially as did the witness William Moore, except that he said nothing about Gassaway following Clark Williams and defendant when the former took the latter out, with his pistol drawn, and making the remark stated by Moore. The witness stated further that he was in the south end of the saloon, facing Gassaway, when Gassaway attempted to draw his pistol from his breast, as stated by Moore, and that he distinctly saw a part of the pistol and knew it to be a white handled pistol. Among others, he saw William Moore in the saloon.

Cal. Tucker, the next witness for the defense, testified that he and Reuben Ponds and Henry Woods were standing in front of Simon's saloon a short time before the difficulty, and observed Captain Gassaway and another gentleman standing inside of the saloon door and between it and the screen. Defendant about that time passed down the street, and Captain Gassaway, calling his friend's attention to the defendant, said to him: "There goes a G—d d—n yellow son of a b—h that I am going to kill, if it costs me ten thousand dollars." Witness thereupon started after the defendant, overtook him and asked him what was the matter between him and Captain Gassaway. Defendant said there was nothing between them. Witness then told defendant what he had heard Gassaway say, and defendant replied: "Oh, that's all right. There's going to be no trouble between us." Witness went home and did not see the difficulty. The witness did not think that defendant heard Gassaway make the remark

about him. He passed between Gassaway and witness and went down to the barber shop, where witness overtook him.

Henry Woods corroborated the testimony of Cal. Tucker, testifying that he went with Tucker and told defendant what Gassaway said. This witness thought defendant heard Gassaway's remark, and he momentarily stopped and looked back. The defense closed.

Clark Williams testified, for the State, in rebuttal, that he was the defendant's step father. On or about December 23, 1885, some one about Marlin told witness that the defendant was about to get into trouble, and witness started out to hunt him. He went first to Simon's saloon. Defendant was not then there. After visiting several other places in quest of defendant, witness returned to Simon's saloon, and when he got to the door he saw the defendant standing in front of Captain Gassaway with his gun drawn on him. Witness passed rapidly to the defendant and took him out the back way and off home. Defendant resisted the witness while being taken out, but afterwards went home quietly. Witness did not know how long defendant had been in Simon's saloon when he, witness, arrived, but it could not have been very long. If Captain Gassaway had any thing in his hands, or made any demonstration towards defendant, the witness did not see or know it. He did not know whether the defendant's gun was cocked or not, nor whether it was loaded or not, when he held it on Captain Gassaway.

The motion for new trial raised the questions discussed in the opinion.

*Alexander, Winter & Dickinson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. The indictment is in the usual form, and the court did not err in overruling exceptions to it. (Willson's Cr. Forms, sec. 357, p. 161, and cases there cited.)

II. It is the well settled law of this State that when any unlawful and violent attack is made by one person upon another, which reasonably indicates to the person attacked that *serious bodily injury* is about to be inflicted upon him, he may kill the assailant at once, without resorting to other means for the prevention of such threatened injury. (Hunnicutt v. The State, 20 Texas Ct. App., 642, and cases therein cited; Lee v. The State,

21 Texas Ct. App., 241). In this case the charge of the court upon the issue of self defense restricts the right of the defendant to kill his assailant, without first resorting to all other means except retreat to prevent the threatened injury, to the prevention of murder, maiming or disfiguring, giving him no such right where the injury threatened might have been other serious bodily injury, until he had first resorted to all other means, except retreat, to prevent such other serious bodily injury. In this respect the charge is defective.

III. It was in proof by two witnesses that prior to the alleged assault by defendant upon Gassaway, and on the same day, said Gassaway had threatened to kill the defendant, and that said threat had, prior to said alleged assault, been communicated to defendant. There was also testimony that at the time of the difficulty, and before the commission of the alleged assault, Gassaway attempted to draw a pistol with which to shoot the defendant, and thus execute said threat. In view of this evidence the court should have charged the law relating to threats, and it was material error to omit to do so. (Sims v. The State, 9 Texas Ct. App., 586.)

IV. Other objections than those above noticed are urged to the charge of the court by counsel for defendant, but the errors complained of are not of a character deemed material, and, in the absence of a bill of exception specifically pointing out such errors, we are not called upon to notice them. There is in the record a general bill of exception to the entire charge, specifying no *error.* Such a bill is entitled to no consideration. (Smith v. the State, ante, 316.)

V. It was not error to admit the testimony in regard to the flight of the defendant from the State after he was indicted, and of his effort to obtain false testimony to be used on his trial. Such testimony is always admissible in cases of circumstantial evidence, and we know of no rule of law which would exclude it in any case, though the reason for its admission in a case like this, where the evidence relied upon by the prosecution to establish the guilt of defendant is direct, is not so apparent as in a case where the evidence is all circumstantial. (Whart. Crim. Ev., sec. 750.)

Because of the errors in the charge of the court which we have mentioned as material, and which might have prejudiced

defendant's rights, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered December 4, 1886.